IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERRENCE L. DAVIS, | No. 2:11-cv-2296-GEB-CMK-P |
| Plaintiff, | |
| vs. | <u>FINDINGS AND RECOMMENDATION</u> |
| HIGH DESERT STATE PRISON, et al., | |
| Defendants. | |
| _____ / | |

Plaintiff, a prisoner proceeding pro se, brings this civil rights action pursuant to 42 U.S.C. § 1983. Pending before the court is defendant's unopposed motion for summary judgment (Doc. 70). The pending motion was filed in January 2015. Plaintiff requested and received numerous extensions of time to file an opposition. Plaintiff was informed several times that this case would not be prolonged indefinitely. Plaintiff had almost two years to oppose the motion, and failed to do so within the extended time provided.

**I. BACKGROUND**

**A.  <u>Plaintiff's Allegations</u>**

This case proceeds on plaintiff's original complaint (Doc. 1) against four remaining defendants: Abdur-Rahman, Pomazal, Burgett and Clark. The remaining claim in

1

plaintiff's complaint is the allegation that the defendants were deliberately indifferent to his medical needs in violation of his Eighth Amendment rights for denying him the specific pain medication of morphine. All other defendants and claims have been dismissed.

**B. Undisputed Facts**

Defendants submit declarations from defendants Abdur-Rahman, Pomazal, and Burgett, a declaration from B. Barnett, M.D., plaintiff's deposition, and plaintiff's medical records authenticated by the custodian of records, in support of their motion and statement of undisputed facts. Plaintiff has not filed any opposition, declaration, or evidence to counter any of the statements or evidence presented by the defendants. From the declarations, deposition transcript and medical records presented to the court, the following relevant facts have been established and, as they are not opposed or challenged in any way, are considered undisputed:

1. Plaintiff is an inmate, incarcerated at High Desert State Prison (HDSP), beginning on October 5, 2010, and at Deuel Vocational Institution (DVI) prior to that;
2. Prior to his transfer to HDSP, plaintiff took gabapentin and morphine for back pain;
3. Plaintiff has been a chronic pain patient because of back pain for fifteen to twenty years before arriving at DVI;
4. Plaintiff had developed allergies to Motrin and Toradol prior to November 3, 2010, and stated to Dr. Abdur-Rahman that gabapentin was not effective by itself;
5. On November 3, 2010, Dr. Abdur-Rahman's first contact with plaintiff, Dr. Abdur-Rahman discontinued plaintiff's prescription for gabapentin and increased the dosage of morphine from 15 mg. to 30 mg., taken twice daily;
6. On October 9, 2010, Nurse Clark's first contact with plaintiff, Nurse Clark referred to plaintiff as a druggie, but provided the prescribed medications to him;
7. Nurse Clark worked at HDSP on second watch. If Nurse Clark did not provide medication to plaintiff on second watch, he would receive his medication from HDSP personnel during third watch;
8. The Medication Administration Records for plaintiff indicate that he did not receive morphine on November 12, 2010, because plaintiff left the pill line;
9. On December 15, 2010, Dr. Abdur-Rahman increased the prescription for morphine to 45 mg., two times per day, and entered into a Pain Management and Controlled Substance Treatment contract with plaintiff on that day, which provided that clinic appointments would be scheduled at least every three months for re-evaluation of the therapy, and that the medication would be discontinued if pain relief is not achieved;
10. On January 14, 2011, Dr. Abdur-Rahman decided to maintain the dosage of morphine at 45 mg., two times per day;
11. On January 31, 2011, Nurse Practitioner Burgett saw plaintiff for complaints of stomach pain, and widespread pain over his shoulders, back, knee, and neck;
12. Defendant Burgett was aware plaintiff had been prescribed morphine for pain, and

that the amount of the dosage had been titrated upwards and increased. Burgett was aware that plaintiff signed a Pain Management and Controlled Substance Treatment Agreement on December 15, 2010. Burgett was also aware that plaintiff had a chronic care follow-up appointment scheduled for February 14, 2011;
13. Plaintiff informed Burgett that his pain was worsening and was not relieved under the current dosage of morphine. Burgett observed plaintiff could move his upper body without difficulty and had no obvious signs of muscle atrophy;
14. Burgett was concerned that plaintiff was being exposed to the risks of taking significant amounts of narcotic pain medication, without any apparent benefit, and discussed with plaintiff the risks and benefits of taking morphine, the risk of hyperalgesia, and continuing an ineffective treatment;
15. Because plaintiff reported his symptoms were not being relieved with the current dosage of morphine, and because of the risks associated with the use of morphine, which included drug addition and overdose, Burgett decided to reduce plaintiff's dosage of morphine, tapering the dosage over a three-week period of time. Burgett did not refuse to provide plaintiff with pain medication, Burgett made this decision with the understanding that plaintiff's condition would be re-assessed on February 14, 2011, and that the dosage of morphine could be changed, as appropriate, at that time, and did not intend to cause a significant injury or unnecessary and wanton infliction of pain to plaintiff;
16. On February 11, 2011, Dr. Abdur-Rahman examined plaintiff in a "man down" clinic evaluation. Dr. Abdur-Rahman referred plaintiff for further evaluation by Dr. Hoffman at the Triage and Treatment Area at HDSP, and did not either refuse to provide medication to plaintiff or reduce his dosage of morphine;
17. Dr. Hoffman examined plaintiff on February 11, 2011, and found plaintiff had normal sensory and strength in all extremities, except the left leg which plaintiff refused to move. The left leg demonstrated no overt signs of dysfunction with normal muscle bulk and tone. X-rays of the lumbar spine were normal, and Dr. Hoffman found no need to prescribe morphine;
18. Dr. Abdur-Rahman saw plaintiff on February 16, 2011, and became aware of the results of Dr. Hoffman's examination. At that time, plaintiff was still receiving morphine, although the dosage was to be tapered and discontinued. Dr. Abdur-Rahman understood that plaintiff's case would be reviewed by the Pain Committee at HDSP, which could determine if additional morphine would be provided;
19. On February 22, 2011, Dr. Abdur-Rahman discussed plaintiff's case with Nurse Reese in response to plaintiff's request for a new prescription of morphine. In Dr. Abdur-Rahman's medical judgment, because of the lack of objective signs of injury, the continued complaints of pain despite taking 45 mg. of morphine, twice daily, and the risks of taking long term dosages of narcotic pain medication, which include drug addiction and death, the request for a new prescription was not medically necessary, and he denied the request for the new prescription of morphine. In making that decision, it was not his desire to cause a significant injury or unnecessary and wanton infliction of pain to plaintiff. When he made the decision, it was his understanding that plaintiff's case would be evaluated by the Pain Committee at HDSP, which could determine if additional morphine would be provided;
20. On March 12, 2011, Dr. Mason prescribed gabapentin, which can be prescribed for relief of pain;

///

21. On March 16, 2011, Dr. Pomazal saw plaintiff in connection with a hunger strike by plaintiff, and the examination of plaintiff's neck and musculoskeletal system revealed no abnormalities;
22. Dr. Pomazal did not feel that a prescription for morphine was medically indicated based on the normal physical examination and the prescription for gabapentin;
23. On March 21, 2011, plaintiff had a follow up appointment with Dr. Pomazal, wherein plaintiff complained of a brain tumor, chronic pain syndrome, and left shoulder pain he described as severe. Plaintiff was in a wheelchair at this visit. Plaintiff's symptoms appeared to have worsened, and Dr. Pomazal prescribed morphine for 15 days, with a dosage of 15 mg. per day;
24. On April 4, 2011, plaintiff saw Dr. Pomazal in connection with a CDCR 1824 Reasonable Modification or Accommodation Request (dated March 9, 2011), in which plaintiff was requesting a referral to a pain specialist, MRI of his brain, back, neck, shoulders, knees and feet;
25. Dr. Pomazal understood that plaintiff's complaints of chronic pain were unchanged as of April 4, 2011;
26. Dr. Pomazal felt an MRI of plaintiff's brain was medically indicated, but not of his back, neck, shoulders, knees and feet;
27. Dr. Pomazal did not find another prescription for morphine was medically indicated, nor a referral to a licensed medical pain specialist;
28. When plaintiff's case was presented to the Pain Management Committee at HDSP, chaired by the Chief Physician and Surgeon, Bonnie Lee, M.D., the recommendation was to not resume the prescription for morphine;
29. There were no findings of anatomic dysfunction or radiologic findings which explain plaintiff's complaints of pain, or justify the prescription of morphine on a long term basis;
30. The medical records demonstrate that all prescribed doses of morphine were provided to plaintiff, except when he refused to accept the drugs or refused to attend the medical line to receive them, and there is no documentation that Nurse Clark failed to provide prescribed morphine to plaintiff;
31. Dr. Abdur-Rahman first increased the dosage of morphine, then referred plaintiff to the Pain Management Committee to determine if additional morphine should be provided;
32. Nurse Practitioner Burgett discontinued the morphine prescription only after reducing the dosage over time, as the morphine could be causing plaintiff's stomach upset, because the morphine was not effective, and because of concern of opioid induced hyperalgesia;
33. The medical judgments of Dr. Abdur-Rahman, Dr. Pomazal, and Burgett that plaintiff was best cared-for without a narcotic prescription was consistent with the medical judgment of other medical providers who cared for plaintiff; and
34. Plaintiff repeatedly manifested signs of drug abuse.

(Mot. for Summ. J., Doc. 70-2).

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Under summary judgment practice, the moving party

4

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. See Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

### III. DISCUSSION

In his complaint, plaintiff alleges defendants Pomazal, Abdur-Rahman, Clark and Burgett all violated his Eighth Amendment rights by denying him necessary pain medication. Specifically, he claims defendant Clark refused to give him his medication in the pill line; defendant Burgett refused to renew his prescription for morphine with no justification; defendant Abdur-Rahman only provided bare minimal care for plaintiff, and allowed defendants Clark and Burgett to take away his pain medication despite the pain management agreement plaintiff had

signed; and defendant Pomazal first under-prescribed the amount of pain medication plaintiff needed, then refused to provide plaintiff any pain medication until plaintiff went on a hunger strike, then only allowed a fifteen day prescription and refused him any more thereafter.

The treatment a prisoner receives in prison and the conditions under which the prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel and unusual punishment. See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan, 511 U.S. 825, 832 (1994). The Eighth Amendment ". . . embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." Estelle v. Gamble, 429 U.S. 97, 102 (1976). Conditions of confinement may, however, be harsh and restrictive. See Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Nonetheless, prison officials must provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety." Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986). A prison official violates the Eighth Amendment only when two requirements are met: (1) objectively, the official's act or omission must be so serious such that it results in the denial of the minimal civilized measure of life's necessities; and (2) subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of inflicting harm. See Farmer, 511 U.S. at 834. Thus, to violate the Eighth Amendment, a prison official must have a "sufficiently culpable mind." See id.

Deliberate indifference to a prisoner's serious illness or injury, or risks of serious injury or illness, gives rise to a claim under the Eighth Amendment. See Estelle, 429 U.S. at 105; see also Farmer, 511 U.S. at 837. This applies to physical as well as dental and mental health needs. See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982). An injury or illness is sufficiently serious if the failure to treat a prisoner's condition could result in further significant injury or the ". . . unnecessary and wanton infliction of pain." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992); see also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994). Factors indicating seriousness are: (1) whether a reasonable doctor would think that the condition is worthy of comment; (2) whether the condition significantly impacts the prisoner's daily

1  activities; and (3) whether the condition is chronic and accompanied by substantial pain.  See
2  Lopez v. Smith, 203 F.3d 1122, 1131-32 (9th Cir. 2000) (en banc).

3  The requirement of deliberate indifference is less stringent in medical needs cases
4  than in other Eighth Amendment contexts because the responsibility to provide inmates with
5  medical care does not generally conflict with competing penological concerns.  See McGuckin,
6  974 F.2d at 1060.  Thus, deference need not be given to the judgment of prison officials as to
7  decisions concerning medical needs.  See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir.
8  1989).  The complete denial of medical attention may constitute deliberate indifference.  See
9  Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir. 1986).  Delay in providing medical
10  treatment, or interference with medical treatment, may also constitute deliberate indifference.
11  See Lopez, 203 F.3d at 1131.  Where delay is alleged, however, the prisoner must also
12  demonstrate that the delay led to further injury.  See McGuckin, 974 F.2d at 1060.

13  Negligence in diagnosing or treating a medical condition does not, however, give
14  rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at 106.  Moreover, a
15  difference of opinion between the prisoner and medical providers concerning the appropriate
16  course of treatment does not give rise to an Eighth Amendment claim.  See Jackson v. McIntosh,
17  90 F.3d 330, 332 (9th Cir. 1996).

18  The remaining claims in this case relate to the refusal of defendant Clark to give
19  plaintiff his prescribed medication on certain dates, and the refusal of the other medical providers
20  to maintain him on his prescription of morphine.  In the complaint, and more fully explained
21  during plaintiff's deposition, plaintiff alleges that defendant Clark denied him medication on
22  three separate occasions: October 11, 2010, October 17, 2010, and November 12, 2010.
23  Defendants contend, and the medical records support, that on November 12, 2010, plaintiff was
24  not given his medication because he left the pill line, not because defendant Clark refused him.
25  Indeed, the medical records are replete with instances where plaintiff refused his medication or
26  did not receive his medication due to his own choices.  While there are no medical records for

the month of October 2010 indicating whether or not plaintiff received his medication, nor is there a declaration from defendant Clark, the defendants argue that even under plaintiff's version of events, the depravation of medication during defendant Clark's shift (second watch) at most amounted to a delay in receiving the medication as plaintiff would have receive his medication on third watch, as plaintiff testified to.  In addition, the deprivation of two doses of medication during the month of October 2010 would not be so serious that it resulted in the denial of the minimal civilized measure of life's necessities.  Thus, the first of two the prong test has not been met.  As such, plaintiff cannot show defendant Clark was deliberately indifferent.

As to plaintiff's prescription for morphine, he claims doctors Abdur-Rahman and Pomazal and nurse practitioner Burgett were deliberate indifferent to his medical needs as each denied him the specific pain medication of morphine.  As set forth in plaintiff's medical records and the defendants' declarations, the defendants did not cut plaintiff off of all pain medication nor did they fail to provide medical treatment to plaintiff for his complaints of pain.  Plaintiff was transferred to HDSP in October 2010.  He brought with him a prescription for morphine and gabapentin.  He stated to Dr. Abdur-Rahman that the gabapentin was not effective, so that was discontinued.  In December 2010, Dr. Abdur-Rahman increased the amount of morphine plaintiff was receiving, and entered into a pain management agreement with plaintiff.  This dosage was maintained in January 2011.  However, by the end of January 2011, nurse practitioner Burgett became concerned with the amount of morphine plaintiff was taking without relief from pain. Burgett was concern that plaintiff was showing signs that he was suffering from opioid-induced hyperalgesia.  Knowing that plaintiff's condition would be reassessed in February 2011, Burgett decided to discontinue plaintiff's prescription for morphine and began to reduce the amount plaintiff was taking. On February 11, 2011, plaintiff went "man-down," to which Dr. Abdur-Rahman responded.  Dr. Abdur-Rahman referred plaintiff to Dr. Hoffman.  Dr. Hoffman's examination of plaintiff was essentially normal, with the exception of plaintiff's left leg as he refused to move it, and Dr. Hoffman found no need to provide plaintiff with morphine.  On

February 22, 2011, Dr. Abdur-Rahman again saw plaintiff, based on plaintiff's request for a new morphine prescription, but found such a prescription was not medically necessary. On March 12, 2011, plaintiff saw Dr. Mason, who issued plaintiff a prescription for gabapentin. Plaintiff then went on a hunger strike. On March 16, Dr. Pomazal examined plaintiff after his hunger strike, which was a normal physical exam, and found no medical need for morphine as plaintiff was taking gabapentin. Dr. Pomazal planned to refer plaintiff to the pain management committee. Plaintiff's symptoms worsened, and on March 21, 2011, Dr. Pomazal issued plaintiff a prescription for morphine for 15 days. On April 4, 2011, Dr. Pomazal saw plaintiff at his request for a referral to a pain specialist and MRIs. Dr. Pomazal determined an MRI of plaintiff's brain was appropriate, but no other MRIs necessary. It was also determined that because plaintiff's pain was unchanged, it was unnecessary to continue the morphine. The pain management committee thereafter recommended not to resume plaintiff's prescription for morphine as plaintiff was showing signs of drug abuse.

The declarations the medical providers submitted to the court in support of their motion show no deliberate indifference. Dr. Abdur-Rahman's declaration sets forth the treatment provided plaintiff, including the examinations, review of plaintiff's medical records, and medications provided. Dr. Abdur-Rahman explains his reasons for agreeing with the decision to terminate plaintiff's prescription for morphine, and his decision not to issue plaintiff a new prescription for morphine, including "the lack of objective signs of injury, the continued complaints of pain despite taking 45 mg. of morphine, twice a day, and the risks of taking long term dosages of narcotic pain medication, which include drug addition and death." (Declaration of S. Abdur-Rahman, Ex. C at 3). Dr. Abdur-Rahman further states that he would have considered a non-narcotic medication, but plaintiff had indicated he was allergic to Motrin and Tramadol and that gabapentin in crushed form upset his stomach. Dr. Abdur-Rahman denies making his decision with any desire to cause plaintiff significant injury or unnecessary and wanton infliction of pain, and knew the decision would be reviewed by the Pain Management

Committee.

Nurse practitioner Burgett's declaration also sets forth the reasons for discontinuing plaintiff's morphine prescription. Burgett states there was concern about plaintiff's exposure to the risks of taking significant amounts of narcotic pain medication, without any apparent benefit, including drug addition and overdose, the risk of hyperalgesia, and continuing an ineffective treatment. Burgett states the decision was made with the understanding that plaintiff was to be re-evaluated two weeks later, and the dosage of morphine could be changed if appropriate at that time. Burgett further states that the decision was made based on the evaluation of plaintiff's condition and professional judgment, not with any desire to cause a significant injury or unnecessary and wanton infliction of pain.

Similarly, Dr. Pomazal's declaration sets forth the encounters with plaintiff and reasons for the decisions made. Dr. Pomazal explains the examination of plaintiff's neck and musculoskeletal system indicated no abnormalities, plaintiff had a current prescription for gabapentin, and there was no medical indication morphine was necessary. Dr. Pomazal's intention was to refer plaintiff's case to the Pain Management Committee. However, ten days after first seeing plaintiff, Dr. Pomazal determined plaintiff's symptoms had become worse, so a prescription for morphine was issued, 15 mg. per day for 15 days. The third contact with plaintiff was for plaintiff's request for MRIs, which were not medically indicated except of plaintiff's brain. At that time, plaintiff's medical records indicated that he was taking gabapentin, his complaints of pain were unchanged after the prescription for morphine, and given the essentially normal examination, it was determined that another prescription for morphine was not medically indicated.

In order for plaintiff to prove the defendants acted with deliberate indifference in violation of his Eighth Amendment rights, he must show both: the act or omission was serious enough to result in the denial of the minimal civilized measure of life's necessities *and* the defendant must have acted unnecessarily and wantonly for the purpose of inflicting harm. First,

the undisputed evidence shows that while plaintiff did not receive the medication he wanted and claimed he needed, none of the defendants refused to treat plaintiff and each of them continued to provide him treatment and alternative pain medications. At best, this is a difference of opinion case between the treatment plaintiff believed he needed and the medical opinions of the treating professionals. Such a difference of opinion cannot support a finding of deliberate indifference. In addition, the defendants have articulated that there was no intent to cause plaintiff unnecessary pain and suffering. The undisputed evidence shows that the defendants had medically sound reasons for discontinuing the morphine, provided alternative pain medication (gabapentin), and had no intention of causing plaintiff significant injury or unnecessary and wanton infliction of pain. Again, as plaintiff has failed to oppose the motion, he offers no evidence to contradict the evidence presented. Thus, neither parts to the test have been met and the undisputed evidence shows no violation of plaintiff's Eighth Amendment rights. Summary judgment in the defendants favor is appropriate.

### IV.  CONCLUSION

The undersigned finds no genuine issue as to any material fact. Given the evidence produced by the defendants, and plaintiff's lack of opposition to the motion for summary judgment, it stands that defendants did not act in violation of plaintiff's Eighth Amendment rights.

Based on the foregoing, the undersigned recommends that:

1. Defendants' motion for summary judgment (Doc. 70) be granted; and
2. The Clerk of the Court be directed to enter judgment and close this case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 20 days after being served with these findings and recommendations, any party may file written objections with the court. The document should be captioned "Objections to Magistrate Judge's

Findings and Recommendations." Failure to file objections within the specified time may waive the right to appeal. See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: January 20, 2017

                                                   **CRAIG M. KELLISON**
                                                   UNITED STATES MAGISTRATE JUDGE